IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

CLARA WATSON, as the personal )
representative of the estate of her son, )
Jamaal Cornelius King, )
                   )
     Plaintiff )
                   )
v. )        CASE NO. 2:22-cv-324
                   )        Jury Trial Requested
JEFFERSON DUNN )
DENNIS W. STAMPER )
ARNALDO MERCADO )
EDWARD ELLINGTON )
CYNTHIA MCCOVERY
JEFFERY BALDWIN )
CHARLES McKEE )
AHMEER DAVIS )
WEXFORD HEALTH SOURCES, INC. )
                   )
     Defendants. )

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND
NOTICE OF SUBSTITUION OF PARTIES**

Plaintiff Clara Watson, Administratrix of the Estate of Jamaal Cornelius

King, deceased, ("Plaintiff") brings this civil rights action arising from the death of

Jamaal King at Elmore Correctional Facility pursuant to 42 U.S.C. §1983, and the

Eighth and Fourteenth Amendments to the U.S. Constitution. Plaintiff complains

as follows:

**INTRODUCTION AND NATURE OF ACTION**

1.      On May 27, 2020, Jamaal King, hereinafter, "King" or "Mr. King"

was murdered at Elmore Correctional Facility (ELC). He was thirty-Three (33) years old at the time of his death.

2.     For several years, up to and including the date of Mr. King's death, pervasive violence plagued Elmore Correctional Facility.

3.     Around the time of Mr. King's death, by its own account, the Alabama Department of Corrections (ADOC) maintained grossly overcrowded and understaffed prisons, was experiencing one of the highest prison homicide rates in the nation, and was the subject of a United States Department of Justice (DOJ) investigation into over-crowding, understaffing, and uncontrolled prevalence of contraband drugs and deadly weapons among inmates, and persistent failures to provide prisoners incarcerated in Alabama's prisons with adequate protection from prisoner-on-prisoner violence.

4.      In December 2020, the DOJ investigation culminated in a lawsuit the DOJ filed against the State of Alabama and the Alabama Department of Corrections for their inability to keep prisoners safe from substantial risk of serious harm - including deadly violence - while incarcerated in Alabama's prisons.

5.     This is a civil action brought by Plaintiff, the personal representative of the estate of her son, Jamaal Cornelius King, against the ADOC administrative officials, correctional staff, and Wexford Health Sources, Inc. who were indifferent to the overcrowding, understaffing, and violent conditions that lead to, resulted in,

and caused and/or contributed to the stabbing death of Jamaal Cornelius King on May 27, 2020, at the Elmore Correctional Facility (ELC) in violation of King's constitutional rights, guaranteed by the Eighth Amendment of the U.S. Constitution, against cruel and unusual punishment.

## JURISDICTION AND VENUE

6.     This action arises under the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

7.     This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the suit occurred in this judicial district.

## PARTIES

8.     Clara Watson is of legal age and a citizen and resident of the state of Alabama and over the age of nineteen (19) years old.   She is the duly appointed representative of the estate of her son, Jamaal Cornelius King, hereinafter "King" or "Mr. King",  The Plaintiff is seeking damages on behalf of Mr. King's heirs, as the representative of his estate, to remedy the violations of Mr. King's rights secured by the United States Constitution. At the time of his death, Mr. King was survived by his daughter, Jamya Ja'hnaye King, age 16.  Mr. King was thirty-three (33) years old at the time of his death.

9.      Defendant Jefferson Dunn, one of ADOC's administrative officials, hereinafter "Dunn" or "Defendant Dunn", was the ADOC Commissioner at all relevant times herein, and is a citizen of Alabama and over the age of nineteen (19) years old.  Defendant Dunn was the Commissioner of the Alabama Department of Corrections ("ADOC") at the time Mr. King was killed on May 27, 2020, and in the months and years preceding his murder. In April 2015, Defendant Dunn was appointed the Commissioner of the ADOC.  The Commissioner is the highest-ranking administrative official in ADOC and is responsible for the direction, supervision, and control of the Department of Corrections. Defendant Dunn is responsible for exercising the authority, functions, and duties of the Commissioner of ADOC including the appointment of personnel and employees within ADOC required for the performance of the ADOC's duties toward the prisoners it incarcerates. Those duties include operating a prison system that respects the constitutional and human rights of prisoners within the custody of ADOC, including the rights belonging to Mr. King while he was a prisoner at Elmore Correctional Facility and Bibb Correctional Facility. Defendant Dunn acted in a supervisory capacity over ADOC's administrative offices and correctional staff the of the Elmore Correctional Facility. The constitutional violations and injuries complained of herein were proximately caused by a pattern and practice of misconduct, acts, and omissions at Elmore Correctional Facility, which occurred

5

with the knowledge and consent of Defendant Dunn, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions and omissions, or by his deliberate indifference and failure to act. Defendant Dunn is sued in his individual capacity.

10.     Defendant Dennis W. Stamper, one of ADOC's administrative officials, hereinafter, "Stamper" or "Defendant Stamper" is a citizen of Alabama and over the age of nineteen (19) years old. At the time Mr. King was killed at Elmore Correctional Facility, and in the months and years preceding his murder, Defendant Stamper was the Deputy Commissioner of Operations for the ADOC. Defendant Stamper first undertook that role in prior to the incident made the basis of this suit. As Deputy Commissioner for Operations, Defendant Stamper was responsible for ensuring the effective and safe daily operations of the ADOC's correctional facilities housing men, including Elmore Correctional Facility where Mr. King had been housed since February 12, 2020.  Defendant Stamper's responsibilities also included directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division. At the time of Mr. King's death, Defendant Stamper was on notice of the dangerous, life-threatening conditions at Elmore Correctional Facility, including the prevalence of violence, understaffing, and overcrowding. Defendant Stamper

knew that prisoners housed at Elmore Correctional Facility were subject to a substantial risk of serious harm from violence as described herein, but he deliberately ignored these known risks of serious harm to prisoners. Defendant Stamper acted in a supervisory capacity over the employees of the Elmore Correctional Facility. The constitutional violations and injuries complained of herein were proximately caused by a pattern and practice of misconduct, acts, and omissions at Elmore Correctional Facility, which occurred with the knowledge and consent of Defendant Stamper, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions and omissions or by his deliberate indifference and failure to act. Defendant Stamper is sued in his individual capacity.

11.    Defendant Arnaldo Mercado, one of ADOC's administrative officials, hereinafter, "Mercado" or "Defendant Mercado" is a citizen of Alabama and over the age of nineteen (19) years old. At the time Mr. King was killed at Elmore Correctional Facility, and in the months preceding his murder, Defendant Mercado was the Chief Law Enforcement Officer of the Law Enforcement Services Division (LESD) for the ADOC. As Chief Law Enforcement Officer, Defendant Mercado was responsible for, among other things, identification and controlling contraband drugs and weapons to ensure the safety of staff, inmates, and nurses, and the

effective and safe daily operations of the ADOC's correctional facilities, including

Elmore Correctional Facility where Mr. King had been housed since February 12,

2020.   Defendant Mercado's responsibilities also included directing and managing

institutional security, staffing, the Classification Review Board, the Training

Division, and the Transfer Division. At the time of Mr. King's death, Defendant

Mercado was on notice of the dangerous, life-threatening conditions at Elmore

Correctional Facility, including the prevalence of violence, understaffing, and

overcrowding. Defendant Mercado knew that prisoners housed at Elmore

Correctional Facility were subject to a substantial risk of serious harm from

violence as described herein, but he deliberately ignored these known risks of

serious harm to prisoners. Defendant Mercado acted in a supervisory capacity over

the correctional staff of the Elmore Correctional Facility. The constitutional

violations and injuries complained of herein were proximately caused by a pattern

and practice of misconduct, acts, and omissions at Elmore Correctional Facility,

which occurred with the knowledge and consent of Defendant Mercado, who

personally knew about, facilitated, approved, and/or condoned this pattern and

practice of misconduct, or at least recklessly caused the alleged deprivation of

rights by his actions and omissions or by his deliberate indifference and failure to

act in alleviating the known and direct threat to prisoners lives, including Mr.

King. Defendant Mercado is sued in his individual capacity.

8

12.     Defendant Edward Ellington, one of ADOC's administrative officials, hereinafter, "Ellington" or "Defendant Ellington" is a citizen of Alabama and over the age of nineteen (19) years old. At the time Mr. King was killed at Elmore Correctional Facility, and in the months and years preceding his murder, Defendant Ellington was the ADOC Regional Director with supervisory authority over transfers of inmates within ADOC system of correctional facilities in the applicable region, who approved Mr. King's warden to warden transfer back to Elmore Correctional Facility, at all relevant times. As ADOC Regional Director, Defendant Ellington was responsible for, among other things, reviewing, classifying, and controlling the transfer of inmates from one correctional facility to another within his designated region of ADOC's correctional facilities, which included Elmore Correctional Facility where Mr. King had been housed since February 12, 2020.  At the time of Mr. King's death, Defendant Ellington was on notice of the dangerous, life-threatening conditions at Elmore Correctional Facility, including the prevalence of violence, understaffing, and overcrowding. Defendant Ellington knew that prisoners housed at Elmore Correctional Facility were subject to a substantial risk of serious harm from violence as described herein, but he deliberately ignored these known risks of serious harm to prisoners. Defendant Ellington acted in a supervisory capacity over inmate transfers from Bibb Correctional Facilitiy to Elmore Correctional Facility, and personally signed off on

9

Mr. King's warden to warden transfer to ECF prior to February 12 2020.  The
constitutional violations and injuries complained of herein were proximately
caused by a pattern and practice of misconduct, acts, and omissions at Elmore
Correctional Facility, which occurred with the knowledge and consent of
Defendant Ellington, who personally knew about, facilitated, approved, and/or
condoned this pattern and practice of misconduct, or at least recklessly caused the
alleged deprivation of rights by his actions and omissions or by his deliberate
indifference and failure to act in alleviating the known and direct threat to
prisoners lives, including Mr. King.  Defendant Ellington is sued in his individual
capacity.

13.    Defendant Cynthia McCovery, one of the correctional staff
defendants, ("McCovery" or "Defendant McCovery") is a citizen of Alabama and
over the age of nineteen (19) years old. Defendant McCovery was the Warden at
Bibb Correctional Facility in the months and years prior to Mr. King being
transferred to ECF from Bibb Correctional Facility and personally approved Mr.
King's warden to warden transfer back to Elmore against his objections. Defendant
McCovery's responsibilities as Warden also included ensuring adequate
supervision and monitoring of prisoners, prison transfers, adequate classification of
prisoners, appropriate housing assignments for prisoners. At the time of Mr. King's
death, Defendant McCovery was on notice of the dangerous, life-threatening

conditions existing at ECF, including the prevalence of violence and deaths,

understaffing, and overcrowding, and the fact that Mr. King had enemies there.

Defendant McCovery knew that prisoners housed at Elmore Correctional Facility

were subject to a substantial risk of harm and death from violence as described

herein, but she deliberately ignored these known risks of serious harm to Mr. King

personally by effectuating a warden to warden transfer of Mr. King.   Defendant

McCovery acting in a supervisory capacity approved the warden to warden transfer

of Mr. King back to Elmore Correctional Facility, a facility known to house Mr.

King's enemies. The constitutional violations and injuries complained of herein

were proximately caused by a pattern and practice of misconduct, acts, and

omissions at Elmore Correctional Facility, which occurred with the knowledge and

consent of Defendant McCovery, who personally knew about, facilitated,

approved, and/or condoned this pattern and practice of misconduct, or at least

recklessly caused the alleged deprivation of rights by her actions and omissions or

by hher deliberate indifference and failure to act. Defendant McCovery is sued in

her individual capacity.

14.     Defendant Jeffery Baldwin, one of the correctional staff defendants,

("Baldwin" or "Defendant Baldwin") is a citizen of Alabama and over the age of

nineteen (19) years old. Defendant Baldwin was the Warden at Elmore

Correctional Facility at the time Mr. King was stabbed to death and in the months

and years preceding his murder. Defendant Baldwin had responsibility for the day-to-day operations at Elmore Correctional Facility, the safety and security of the prisoners housed in the prison, and the supervision of all subordinate employees working in the prison.  Defendant Baldwin 's responsibilities as Warden also included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security. At the time of Mr. King's death, Defendant Baldwin was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, due to understaffing, and overcrowding. Defendant Baldwin knew that prisoners housed at Elmore Correctional Facility were subject to a substantial risk of serious harm from violence as described herein, but he deliberately ignored these known risks of serious harm to prisoners by effectuating a Warden to Warden transfer of Mr. King, against his objections.  Defendant Baldwin acted in a supervisory capacity over the employees of the Elmore Correctional Facility and approved the transfer of Mr. King back to Elmore Correctional Facility over his objections, a facility known to house Mr. King's enemies.   The constitutional

12

violations and injuries complained of herein were proximately caused by a pattern and practice of misconduct, acts, and omissions at Elmore Correctional Facility, which occurred with the knowledge and consent of Defendant Baldwin, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act. Defendant Baldwin is sued in his individual capacity.

15.    Defendant Charles McKee, one of the correctional staff defendants, ("McKee" or "Defendant McKee") is a citizen of Alabama and over the age of nineteen (19) years old. Defendant McKee was the Correctional Captain at Elmore Correctional Facility at the time Mr. King was stabbed to death and in the months and years preceding his murder. Defendant McKee had responsibility for the day-to-day operations at Elmore Correctional Facility, the safety and security of the prisoners housed in the prison, and the supervision of all subordinate employees working in the prison.  Defendant McKee's responsibilities also included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other

security devices necessary for safety and security. At the time of Mr. King's death, Defendant McKee was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, due to understaffing, and overcrowding. Defendant McKee knew that prisoners housed at Elmore Correctional Facility were subject to a substantial risk of serious harm from violence as described herein, but he deliberately ignored these known risks of serious harm to prisoners. Defendant McKee acted in a supervisory capacity over the employees of the Elmore Correctional Facility. The constitutional violations and injuries complained of herein were proximately caused by a pattern and practice of misconduct, acts, and omissions at Elmore Correctional Facility, which occurred with the consent of Defendant McKee, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act. Defendant McKee is sued in his individual capacity.

16.     Defendant Ahmeer Davis, one of the correctional staff defendants, ("Davis" or "Defendant Davis") is a citizen of Alabama and over the age of nineteen (19) years old. Defendant Davis was assigned to work as the C1 Housing Unit Officer with authority over security in dormitory (C1) on the date in which Mr. King was killed, and failed to prevent the stabbing and death. Defendant Davis

was responsible for the safety and security of the prisoners incarcerated at Elmore

Correctional Facility and for monitoring and supervising them when working in the

prison's dormitories. Defendant Davis was working in the shift office on the day

Mr. King was killed and was assigned the C1 the dormitory which housed both Mr.

King and Kori Brown but failed to monitor said dormitory for violent activity, and

in omitting to monitor said housing unit failed to prevent confrontation between

Brown and King, and the resulting stabbing death to Mr. King. Defendant Davis is

sued in his individual capacity.

## STATEMENT OF FACTS

### I.   OVERCROWDING, UNDERSTAFFING, AND VIOLENCE THROUGHOUT ADOC FACILITIES

17.    The United States Constitution guarantees that all persons within the

custody of the ADOC have a right to be housed in safe conditions and not be

subjected to violence.

18.    For years, understaffing has been a persistent, systemic problem that

leaves many ADOC facilities including Elmore Correctional Facility incredibly

dangerous and out of control.

19.    By the end of 2015 Defendant Dunn acknowledged that the Alabama

Department of Corrections would face violent consequences from prison

overcrowding and understaffing.

20.     On October 6, 2016, the United States Department of Justice announced that it had opened a Civil Rights of Institutionalized Persons Act ("CRIPA") investigation into Alabama's male prisons, including Elmore Correctional Facility, more than four years prior to Mr. King being stabbed.

21.     In June of 2017, the United States District Court found that "ADOC facilities are significantly and chronically overcrowded." Braggs v. Dunn, 257 F. Supp. 3d 1171, 1193 (M.D. Ala. 2017). The court's findings pertained to, in part, a time period prior to the time Mr. King was imprisoned at Elmore Correctional Facility.

22.     The court further noted that "The combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." Braggs, 257 F. Supp. 3d at 1200.

23.     Defendant Dunn himself, in sworn testimony in the United States District Court for the Middle District Of Alabama "aptly described the prison system as wrestling with a 'twoheaded monster': overcrowding and understaffing." Braggs, 257 F. Supp. 3d at 1184.

24.    On April 2, 2019 the U. S. Department of Justice Civil Rights Division Released the results of their investigation into Alabama Department of Corrections, hereinafter called the "DOJ Report".

25.    All of the named Defendants were notified of the following findings within the DOJ Report,

"2. There is reasonable cause to believe that the Alabama Department of Corrections ("ADOC") has violated and is continuing to violate the Eighth Amendment rights of prisoners housed in men's prisons by failing to protect them from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions, and that such violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment. The violations are severe, systemic, and exacerbated by serious deficiencies in staffing and supervision; overcrowding; ineffective housing and classification protocols; inadequate incident reporting; inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons; ineffective prison management and training;"

26.    Elmore Correctional Facility was one of the prisons cited in the DOJ Report, however, Dunn, Stamper, and Mercado took no action to alleviate the problems cited by the DOJ report. In addition, in spite of this report, Defendants Ellington, McCovery and Baldwin transferred Mr. King against his known fear of

returning back to Elmore with full knowledge of the findings of the DOJ Report and the dangerous and substantial threat that existed at Elmore Correctional Facility, especially for Mr. King, should he return.

27.    Despite the professed values in its own policy statements contained in ADOC's annual reports to Governor Ivy, and acknowledgment of forthcoming, violence due to overcrowding and understaffing, and the prevalence of contraband drugs and weapons, the violence nevertheless continued unabated throughout 2020 in ADOC prisons, including Elmore, one of the most violent prisons in the state, up to and including the day Mr. King was murdered.

28.    Acting under color of law, the administrative official defendants and the correctional officer defendants caused a deprivation of Mr. King's federal rights by failing to take reasonable measures to guarantee his safety under the Eighth Amendment.

## II.    OVERCROWDING, UNDERSTAFFING, CONTRABAND AND VIOLENCE AT ELMORE CORRECTIONAL FACILITY

29.    Defendants Dunn, Stamper, and Mercado, the administrative officials, had been briefed about overcrowding, correctional understaffing, and ongoing violence, inmate on inmate violence, and threats of violence toward prisoners at Elmore Correctional Facility in the months and years leading up to Mr. King's death. Despite their knowledge of substantial risks of serious harm to prisoners at

Elmore Correctional Facility, Defendant Dunn, Stamper, and Mercado failed to act
to prevent prisoners at Elmore Correctional Facility, including Mr. King, from
suffering injury and death.

30.     Defendants Ellington and McCovery had been briefed about
overcrowding, correctional understaffing, and ongoing violence and inmate on
inmate violence and threats of violence toward prisoners at Elmore Correctional
Facility in the months and years leading up to Mr. King's death. Despite their
knowledge of substantial risks of serious harm to prisoners, and especially Mr.
King, at Elmore Correctional Facility, Defendants Ellington and McCovery
transferred Mr. King to the Elmore Correctional Facility on a warden to warden
transfer, disregarding his known fear of returning to Elmore and desire to stay at
the Bibb Correctional Facility, where he was away from his enemies. Defendants
Ellington and McCovery returned Mr. King to Elmore go back to Elmore, one of
ADOC's most dangerous prisons, and one in which Mr. King had enemies, and
where Mr. King was eventually stabbed in the back by another prisoner several
months after his arrival.

31.     Defendants Baldwin, and McKee had been briefed about
overcrowding, correctional understaffing, and ongoing inmate on inmate violence
and threats of violence toward prisoners at Elmore Correctional Facility in the
months and years leading up to Mr. King's death. Despite their knowledge of

substantial risks of serious harm to prisoners at Elmore Correctional Facility,

Defendants Baldwin, and McKee approved Mr. Kings warden to warden transfer to

the Elmore Correctional Facility, disregarding his fear of returning to Elmore and

desire to stay at the Bibb Correctional Facility, where he was away from his

enemies. Defendants McCovery and Baldwin returned Mr. King to back to Elmore,

one of ADOC's most dangerous prisons, and one in which Mr. King had enemies,

where Mr.King would eventually be stabbed in the back by another prisoner

several months after his arrival.

32.     Elmore Correctional Facility was one of the prisons cited in the DOJ

Report, however, Dunn, Stamper, Mercado, Ellington, McCovery, Baldwin, and

McKee took no action to alleviate the problems cited by the DOJ report. In

addition, in spite of this report, Ellington, McCovery, Baldwin transferred Mr.

King to Elmore with full knowledge of the findings of the DOJ Report and the

dangerous conditions that existed at Elmore Correctional Facility against Mr.

King's fear of returning back to Elmore, one of ADOC's most dangerous prisons,

and one in which Mr. King had enemies, where Mr.King was eventually stabbed in

the back by another prisoner several months after his arrival.

33.     Elmore Correctional Facility originally was built in 1981 and

renovated in 1991. The prison's design capacity is approximately 600 prisoners. At

the time of Mr. King's death the prison's census was over double its design capacity.

34.    Elinore Correctional Facility is a medium custody prison, and at the time of Mr. King's death, there were many violent offenders in the prison population.

35.    Prisoners at Elmore Correctional Facility are often double-bunked, the officers' lines of sight inside the dormitories are limited, and this combination can lead to a higher risk of violent activity.

36.    The culture of violence at Elmore Correctional Facility was widely known throughout the Alabama Department of Corrections prior to Mr. King's murder.

37.    In July 2013, the Equal Justice Initiative complained to the Alabama Department of Corrections of widespread physical abuse and other misconduct at Elmore Correctional Facility.

38.    The Alabama Department of Corrections began its own investigation into Elmore Correctional Facility in July 2013.

39.    Later that year, in October 2013, Derrick Denis was stabbed to death by another prisoner at at Elmore Correctional Facility.

40.    Eight (8) prisoners were sent to Jackson Hospital in Montgomery, Alabama (three (3) were admitted for treatment) in March 2014, following prisoner

on prisoner violence in the course of a riot in one of Elmore Correctional Facility's dormitories.

41.    In addition to the overcrowding and understaffing, the violence at Elmore Correctional Facility perpetuates year after year because its correctional officers continue to lack training and supervision needed to turn the tide of unrelenting violence inside prison walls.

42.    In 2017, some three years prior to Mr. King's death, the Alabama Department of Corrections reported that its correctional officer staffing rate at Elmore Correctional Facility was a mere 47.3% as the prison was only able to fill eighty (80) of the 169 authorized correctional officer positions. Meanwhile, the prisoner census at the prison hovered around 195% of capacity.

43.    During the month of August of 2016, Elmore Correctional Facility recorded thirteen (13) assaults for a total of seventy-two (72) from January through the end of the month.

44.    In an eighteen (18) month window from February 2015 through August 2016, there were three (3) prisoner homicides at Elmore Correctional Facility.

45.    In February 2015, William D. Shepherd, age 33, was stabbed to death by another prisoner at Elmore Correctional Facility.

46.     In March 2016, Johnny Lee Spears, age 31, was stabbed to death by another prisoner at Elmore Correctional Facility.

47.     In August 2016,  Davieon Williams, age 24, was stabbed to death by another prisoner at Elmore Correctional Facility.

48.     Conditions at Elmore Correctional Facility have only gotten worse and inmate on inmate violence has increased over the last several years.

49.     In February 2017, David Sanders, age 41, was beaten to death by another prisoner at Elmore Correctional Facility.

50.     In February 2017, Grant Mickens, age 35, was stabbed to death by another prisoner at Elmore Correctional Facility.

51.     In February 2017, Demarco Carlisle, age 36, was stabbed to death by another prisoner at Elmore Correctional Facility.

52.     In July 2017, Timothy Robertson, age 47, was stabbed to death by another prisoner at Elmore Correctional Facility.

53.     From January through July 2017, five inmate on inmate deaths occurred by other inmates at Elmore Correctional Facility.

54.     In November 2017, Billy Matthew Smith, age 29, died after being struck by another inmate, and beaten and hog-tied by a correction officer, and neglected by a nurse at Elmore Correctional Facility.

55.    In November 2018, James Lewis Kennedy, age 39, was stabbed to death by another prisoner at Elmore Correctional Facility.

56.    In December 2019, Cornelius Jackson, died at Elmore Correctional Facility after being ignored by correction officers while other inmates begged the correction officers to get him medical help.

57.    And on May 27, 2020, Jamaal Cornelius King, age 33, was stabbed in the back six times by another prisoner at Elmore Correctional Facility resulting in his bleeding to death.

58.    At all times material to this action, the Administrative Official Defendants and the correction officer defendants knew of the prevalence of contraband weapons and drugs, uncontrolled movement of inmates, the understaffing, and overcrowding at Elmore Correctional Facility, and knew that they needed to take steps to prevent the flow of contraband, control movement, reduce overcrowding or ensure adequate staffing in order to prevent further murders and assaults, but failed to do so.  Contraband weaponry was readily available to prisoners at Elmore Correctional Facility, including but not limited to, the contraband weapon used to kill Mr. King.

59.    Defendants Dunn, Stamper, Mercado, and Ellington herein referred to as "the administrative staff" had direct knowledge of contraband weaponry and drugs, overcrowding, correctional understaffing, and ongoing violence and threats

of violence toward prisoners and correctional officers at Elmore Correctional

Facility in the months leading up to Mr. King's death. Despite their knowledge of

direct threat of serious harm to Mr. King and other prisoners at Elmore

Correctional Facility, the administrative staff took no action to try to prevent

Eighth Amendment violations to Mr. King and other prisoners at Elmore

Correctional Facility which caused much inmate suffering, injury, and death.

60.     Prisoners were also returned to hostile environments of the same

housing unit at Elmore Correctional Facility after violent altercations in

contravention to national correctional standards, department policy, the prison's

accepted procedures, and common sense.

61.     The correctional staff defendants McCovery, Baldwin, McKee, and

Davis were aware of other violent incidents occurring in the same housing unit in

which Mr. King was killed.

62.     Prior to Mr. King's death, the correctional staff defendants McCovery,

Baldwin, McKee, and Davis Defendants were aware of other violent incidents and

contraband weaponry occurring at Elmore Correctional Facility. Despite their

knowledge of substantial risks of serious harm to Mr. King and other prisoners at

Elmore Correctional Facility, said correctional staff defendants took no action to

try to prevent Eighth Amendment violations to Mr. King and other prisoners at

Elmore Correctional Facility which caused much inmate suffering, injury, and death.

## II.   JAMAAL CORNELIUS KING'S DEATH AT ELMORE CORRECTIONAL FACILITY

63.    Several years prior to Mr. King's being killed, he called his mother, the Plaintiff herein, from Elmore, and told her he had enemies at Elmore Correctional Facility and wanted to be moved. The Plaintiff informed Warden at the time, and was instrumental in getting Mr. King transferred away from Elmore Correctional Facility. After many transfers however throughout the ADOC prison system, and a reduction of his classification to its lowest level, he was able to work at Childersburg Work Release, for awhile until he was ultimately was transferred at Bibb Correctional Facility where he was away from his enemies.

64.    On or about February 12, 2020, Mr. King was transferred from Bibb Correctional Facility back to Elmore Correctional Facility, on a Warden to Warden transfer by Defendants McCovery and Baldwin with the approval of Defendant Ellington, and three months later King was stabbed in the back by another inmate and died.

65.    After his transfer back at Elmore, Mr. King reported that a kitchen employee at Elmore had threatened and told him he would be sorry for reporting that the employee had been harassing him. Later Mr. King reported that two correctional officers were harassing him.

65.     Plaintiff is informed and believes her son's stabbing occurred on the morning of May 27, 2020 and that her son died later that day.

66.     Mr. King bled profusely from six stab wounds and according to the ADOC Incident Report was not discovered by corrections officers until around 2:25 PM according to the report.

67.     Plaintiff is informed and believes that the cameras in or around the area where Mr. King was stabbed, were not operating at the time of the incident or if they were working, the true time of the stabbing may not be reflected accurately on the Incident Report.

68.     Plaintiff is informed and believes there was a delay of several hours between the time Mr. King was discovered bleeding and taken to the Staton Infirmary, during which time he was questioned by Defendant Davis but not taken for emergency medical treatment.

69.     After his discovery, Mr. King was taken by stretcher to the Staton Infirmary rather than for emergency medical treatment or hospital ER. According to the ADOC Incident Report, defendant Staton Prison Dr. pronounced Mr. King deceased at approximately 3:30 PM.

70.     Plaintiff has requested copies of the ADOC's medical records, Alabama Department of Forensic Sciences Autopsy Report, ADOC I & I Investigative Report, videos, photographs, and radio communications from ADOC

authorities but as of the date of filing of this amended complaint has not been provided these records.

71.     Plaintiff is informed and believes that on the date of her son's death, her son, Mr. King and Kori Brown had been in a physical confrontation with each other earlier the same day in dorm at C1 Housing Unit, and that due to the fact that cameras in the C1 dormitory were not functioning, the confrontation went unnoticed by correction officer Davis.

72.     The administrative officials and correctional staff defendants were aware of Mr. King's concerns for his safety, specifically, his fear of returning back to Elmore Correctional Facility, a prison where he had enemies, yet did nothing to prevent the harm that came to him on May 27, 2020.

73.     Jamaal King was repeatedly stabbed in the back by another prisoner Kori Brown in his CI dormitory at Elmore Correctional Facility on May 27, 2020.

74.     At the time Kori Brown stabbed Mr. King six times with contraband weaponry, the C1 dormitory where both prisoners were housed was grossly understaffed, severely overcrowded,  The correctional staff defendants at Elmore Correctional Facility had notice of the prison's chronic understaffing of correctional officers and overcrowding of prisoners, prevalence of contraband drugs and deadly weapons, and lack of functioning cameras in C1 dormitory, and knew or should have known the substantial risk of harm to prisoners in that unit

28

but failed to take reasonable steps to alleviate the direct that threat of harm, which ultimately led to the stabbing death to Mr. King by inmate Kori Brown.

75.     Since the C1 dormitory cameras were non functional, neither Defendant Davis, nor any other corrections officers on duty at the time, nor any of the correctional staff were available to prevent the stabbing, to halt the stabbing timely, or to rescue Mr. King timely to save his life, or if they were available and the cameras were working, they ignored the inmate to inmate confrontation between Mr. King and Kori Brown, when they had every opportunity to intervene and prevent the fatal injuries to Mr. King.

76.     Plaintiff is informed and believes that Kori Aundrey Brown has now been charged with Capital Murder of Mr. King, in the District Court of Elmore County, Alabama, Case No.: DC-2022-000469.00 and is awaiting indictment at the time of filing this lawsuit.

77.     Despite her ADOC records request for information about her son's death, other than an ADOC Incident Report, the Plaintiff has not been provided video or photo evidence of the scene of the stabbing nor the I & I Investigation file of circumstances surrounding Mr. Kings untimely death on May 26, 2020.

78.     The correctional staff defendants were deliberately indifferent in responding to the known threats to Mr. Kings life by inmate Brown, security violations, prevalence of drug and weapon contraband, safety violations, and

29

Eighth Amendment violations at Elmore Correctional Facility, even as the level of violence has escalated.

79.     The correctional staff defendants were on notice that the inmate charged with killing Mr. King had a history of violence and assault and had been in a physical altercation with Mr. King earlier in the day but were deliberately indifferent to it.

80.     Instead of taking reasonable precautions to prevent Brown from further harming Mr. King and other prisoners, The correction staff defendants continued to house him in an area of Elmore Correctional Facility that was significantly overcrowded, grossly understaffed, and into which they housed his eventual victim.

81.      The correction staff defendants actions and inactions proximately caused Mr. King's death, in violation of his Eighth Amendment rights not to suffer cruel and undue punishment while incarcerated.  The Plaintiff seeks punitive damages from the named Defendants for her son's death due to their deliberate indifference to his health and safety, and failure to protect him from harm while incarcerated at Elmore Correctional Facility.

82.     The correction staff defendants knew that Mr. King faced a substantial risk of serious harm in his housing unit at Elmore Correctional Facility both before and especially after his altercation with Brown earlier in the day on May 27, 2020.

83.     Nevertheless, the correction staff defendants Elmore disregarded known risks to Mr. King's security and safety by housing him in an understaffed, overcrowded, and unsafe dormitory at Elmore Correctional Facility in which contraband weaponry was readily available.

84.     The corrections staff defendants failure to perform shakedowns and monitor contraband drugs and weapons in accordance with ADOC policy was a direct and proximate cause of the deadly violence which led to Mr. King's death.

85.     The corrections staff defendants knew or should have known of earlier confrontations between Kori Brown and Mr. King, but for the cameras in housing unit C1 being non-functional, failed to prevent the subsequent deadly confrontation between them.

86.      Defendant Wexford and its physicians, nurses, and other agents, servants, employees on duty at ECF and the Staton Infirmary, herein referred to as "Wexford" delayed, denied, and/or were deliberately indifferent to Mr. King's serious medical needs as he lay dying from mortal stab wounds over his body, and by failing to immediately provide or otherwise obtain emergency medical equipment and supplies, treatment and hospitalization for Mr. King's serious medical needs as he was bleeding to death from his wounds.

## CAUSES OF ACTION

## COUNT ONE

### Violation of Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983
### (Failure to Prevent Harm Against Administrative Officials and Correctional Staff Defendants)

87.     The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

88.     The Administrative Official Defendants and Correctional Staff Defendants knew or had reason to know for years that their failure to take actions to resolve Elmore's overcrowding and understaffing, and the lack of constant shakedowns to control the prevalence of contraband drugs and weapons at Elmore resulted in a large number inmate on inmate stabbings and deaths making Elmore one of the most dangerous prisons in Alabama. There was such widespread violence at Elmore, that said defendants had become so deliberately indifferent to it by the time of Mr. King's death, such that each prisoner at Elmore was forced to carry a homemade weapon to protect himself against violent attacks by other prisoners, and that said violence became the norm at Elmore.

89.     Said Defendants ignored written protocols for the recommended number of correctional officers at Elmore, maximum prisoner housing at Elmore, classification requirements, and the monitoring of illegal drugs and weapons, all of

32

which could have prevented the violation of Mr. King's Eighth Amendment rights and ultimately his death.

90.     Said Defendants indifference to their own written policies placed Jamaal King at unreasonable and foreseeable risk of serious injury and death.

91.     Said Defendants were on notice of the numerous investigations of ADOC by the DOJ and by the Equal Justice Initiative, and by a lawsuit filed by the DOJ, regarding Eighth Amendment violations throughout ADOC and the Elmore Correctional Facility.

92.     The Eighth Amendment imposes a duty of prison officials to protect prisoners from violence at the hands of other prisoners and said defendants knew or should have known their acts and omissions violated the federal rights of all prisoners at Elmore including Mr. Kings federal rights.

93.     Said defendants had at least the following duties:

a. To see that measures were in place to reasonably ensure prisoners' safety, including the safety of Jamaal King; and

b. To attend to such measures and reasonably ensure prisoners' safety, including the safety of Jamaal King.

94.     Said Defendants breached these duties and were deliberately indifferent to the substantial risk of harm to Mr. King in at least the following manner:

33

a. Failing to protect Mr. King from serious risk of death at the hands of a foreseeable assailant.

b. Failing to heed specific warnings regarding the risk of serious injury or death to Mr. King at the hands of a foreseeable assailant.

c. Failing to adequately watch or supervise the C1 housing unit where Mr. King was located;

d. Failing to act quickly when the fight started to prevent injury to Mr. King;

e. Failing to intervene and prevent Mr. King's death;

f. Failing to remove contraband drugs and weaponry from Mr. King's housing unit; and

g. Ignoring policies and procedures concerning overcrowding, understaffing, and security by controlling contraband drugs and weapons, and/or by failing to adequately supervise or train employees in accordance with said policies and procedures, and/or by failing to attend to such policies and procedures so as to ensure the safety of prisoners such as Mr. King.

95.     Said defendants acted with deliberate indifference to the safety of Mr. King while he was incarcerated at Elmore Correctional Facility by failing to take reasonable steps to protect Mr. King and prevent his death when there was a substantial risk of harm. As a consequence, Mr. King was incarcerated under

conditions posing a substantial risk of serious harm and which ultimately led to his death.

96.     Said Defendants' deliberate indifference to the serious risk of harm to Mr. King and the resulting harm that came to Mr. King was a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

97.     Said defendants knew harm would result to prisoners in housing unit C1, including Mr. King but disregarded the excessive risks of harm to Mr. King's by failing to take the above described reasonable steps to avoid the inevitable harm that came to Mr. King.

98.     Said defendants overcrowding of inmates, understaffing of corrections officers, and the total lack of regular shakedowns to control contraband drugs and deadly weapons led to stress and tension among the inmates, and a disproportionate increase in prisoner on prisoner violent confrontations in the C1 dormitory at Elmore which ultimately led to Mr. King's death.

99.     With said Defendants failure to staff enough corrections officers to perform shakedowns to keep the housing unit clear of drugs and weaponry, or working cameras to maintain security for the number of prisoners housed in the C1 dormitory, or to take actions to prevent prisoner on prisoner confrontations from

escalating into violence or deadly confrontations, Mr. King was faced with the daily threat of violence and death in the C1 dormitory where he was killed.

100.   Said Defendants failed to take reasonable measures to guarantee the safety of Mr. King and other prisoners, including protecting Mr. King and other prisoners from violence at the hands of other prisoners.

101.   The amount and type of prisoner on prisoner violence incidents at Elmore were a result of the Administrative Official Defendants and Correctional Official Defendants failing to take reasonable measures to guarantee the safety of the Elmore prisoners, which ultimately led to Mr. King's death.

102.   Acting under color of law, the administrative official defendants and the correctional officer defendants caused a deprivation of Mr. King's federal rights.

103.   As a proximate result of said Defendants above described acts and omissions, Mr. King was attacked, experienced grave physical, emotional, and psychological injury and pain and died.

104.   The Defendants' above-described actions and omissions were deliberate in nature and in reckless disregard of the constitutional rights of Mr. King as described above. Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial. Punitive damages are necessary to

deter future Eighth Amendment violations by these Defendants and at Elmore

Correctional Facility.

## COUNT TWO

**Violation of Eighth and Fourteenth Amendments to the United States
Constitution and 42 U.S.C. § 1983 (Against All Defendants)
Deliberate Indifference to Serious Medical Needs
(Against Defendants Dunn, Baldwin, Wexford and its physicians, nurses, and
other agents, servants, employees)**

105.   The Plaintiff adopts and incorporates by reference each and every

allegation contained in the preceding paragraphs of this First Amended Complaint

as if fully set forth herein.

106.   On or about May 27, 2020, Defendants Dunn, Baldwin, Wexford and

its physicians, nurses, and other agents, servants, employees, acting under color of

state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately

indifferent to Mr. King's, serious medical needs in that they had knowledge of Mr.

King's serious medical need and condition requiring emergency medical treatment

yet refused to obtain or authorize that treatment for Mr. King by delaying or

denying said treatment.

107.   The decisions of these individual defendants to deny Mr. King

medical care for inmate on inmate stabbing wounds were pursuant to one or more

policies or customs at the Elmore Correctional Facility which included inadequate

correction officer training, allowing untrained and/or poorly trained corrections

officers to make decisions regarding medical treatment, and denying and delaying necessary medical care to inmates with serious medical needs in order to avoid incurring charges for said medical treatment, overcrowded prison, and understaffed correction officer and medical staffs.

108.    As a result of these defendants deliberate indifference to Mr. King's serious medical needs for emergency treatment Mr. King experienced severe pain, suffering, and death thereby depriving Mr. King of his clearly established rights as a prisoner under the Eighth and Fourteenth Amendments to the Constitution of the United States in violation of 42 U.S.C. § 1983.

109.    The delay and/or denial of emergency medical treatment to Mr. King for the above-described serious medical need condition is directly attributable to one or more customs and/or policies of the Defendants and/or violations of one or more customs and policies.

110.    As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Mr. King was left unprotected; was attacked; experienced grave physical, emotional, and psychological injury and pain; and died.

111.    The Defendants' above-described actions were deliberate and in reckless disregard of the constitutional rights of Mr. King. Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial.

Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants and at Elmore Correctional Facility.

## COUNT THREE

### Violation of Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983
### (Deliberate Indifference to Health and Safety, Against All Defendants)

112.   The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

113.   All of said Defendants acting under color of law within the meaning of 42 U.S.C. § 1983, were deliberately indifferent to a known threat of harm to Mr. King by their willful and wanton overcrowding of inmates in C1 Housing Unit, understaffing of correctional officers in the C1 housing unit, failure to alleviate inadequate and/or non-functional monitoring equipment, and knowledge of and failure to alleviate the widespread use of contraband drugs and possession of deadly weapons by the inmates in the C1 housing dorm, which ultimately led to Mr. Kings stabbing and demise.

114.   All of said Defendants failed to intervene, protect, and keep Mr. King safe from harm from other dangerous inmates, which ultimately resulted in Mr. King being killed by another inmate. These individual defendants did thereby deprive Mr. King of his rights under the Eighth Amendment to the Constitution of

the United States in violation of 42 U.S.C. § 1983.

115.   As a result of the above described conduct of defendants, King died on May 27, 2020.

## COUNT FOUR
### State Law Wrongful Death

116.   The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

117.   Defendants Dunn and Wexford and its physicians, nurses, and other agents, servants, employees, caused the wrongful death of Mr. King as contemplated by Alabama Code § 6-5-410.

118.   Defendants Dunn and Wexford and its physicians, nurses, and other agents, servants, employees, owed a duty to Mr. King to provide him with a standard of medical care of the degree of diligence and skill common in the prison medical community and applicable to prisoners such as Mr. King experiencing the effects of six mortal stab wounds, to make sure correction officers and medical personnel were trained adequately regarding the proper care of such patients in emergencies such as that presented herein, and that adequate policies and procedures, and medical protocols regarding the proper emergency care of such prisoners were in place and being followed at the time of the emergency.

119.   This duty required Dunn and Wexler to appropriate adequate funding at the Elmore facility, and to provide a standard of care, trained medical personnel, medical equipment and supplies at Elmore sufficient to address emergency situations, like the stabbing of Mr. King, on the scene once Mr. King's condition was discovered since such stabling were a common occurrence at Elmore, and to monitor Mr. King's condition under physician supervision, to have on hand and administer proper emergency and lifesaving medications to stabilize Mr. King prior to transporting Mr. King to a trauma center, and that referral of Mr. King for emergency medical or other appropriate treatment, including having on hand adequate equipment and supplies, medications, and properly trained personnel on the scene once Mr. King's condition was discovered.

120.   Defendants Dunn, Wexford and its physicians, nurses, and other agents, servants, employees, specifically, breached their duty to Mr. King by failing to discover Mr. King's stab wounds in a timely manner, and once discovered by their failure to have properly trained personnel immediately available on the scene with the necessary emergency medical equipment and supplies, and skills to save Mr. King's life, in violation of their duty of care to Mr. King, and in violation their own policies and procedures, specifically to have emergency personnel, equipment, and medicines immediately available at the scene to stabilize Mr. King prior to his removal from the scene, and in so doing

41

violated their statutory duty under Alabama and Federal law to attend to the emergency medical needs of Mr. King on the scene at the Elmore Correctional Facility, prior to transporting him.

121.   Defendants Dunn, Wexford including its physicians, nurses, and other agents, servants, employees, specifically breached their duty of care owed to Mr. King by failing to adequately fund medical services at Elmore, and by providing a less than adequate standard of care, and by violating their own protocols, and in so doing failed to attend to the medical needs of Mr. King on the scene at the Elmore Correctional Facility which ultimately resulted in his death.

122.   Defendants Dunn, Wexford and its physicians, nurses, and other agents, servants, employees, negligent and/or wanton violation of the duties of care owed to Mr. King proximately caused his death. This was a foreseeable result of said defendants' negligent and/or wanton conduct.

## RELIEF SOUGHT

WHEREFORE, the Plaintiff respectfully prays for the following relief:

(a) Assume jurisdiction over this action;

(b) Grant the Plaintiff a trial by a struck jury;

(c) Declare that the acts and omissions described herein violated Jamaal King's rights under the Constitution and laws of the United States;

(d) Enter judgment in favor of the Plaintiff and against each Defendant for all damages allowed by law;

(e) Award the Plaintiff prejudgment and postjudgment interest at the highest rates allowed by law;

(f) Award the Plaintiff the costs of this lawsuit and reasonable attorneys' and expert fees and expenses pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise allowed by law; and

(g) Order such other, further, and different relief as this Honorable Court may deem just and proper.

Dated August 29, 2022.

Respectfully submitted,

*/s/Anthony Piazza*
Anthony Piazza, Esq.

ANTHONY PIAZZA, P.C.
P. O. Box 550217
Birmingham, AL  35255
Phone (205) 617-6211
**anthonypiazza0326@hotmail.com**